IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DION MATHEWS,

                  Plaintiff,              OPINION AND ORDER

v.                                          16-cv-650-slc

CAPTAIN LEBBEUS BROWN, *et al.*,

                  Defendants.

---

*Pro se* plaintiff Dion Mathews [1] is proceeding in this matter on Due Process and First Amendment claims against employees at the Wisconsin Secure Program Facility (WSPF). Those defendants were responsible for issuing him a conduct report and punishing him with 50 days of disciplinary separation status because he violated Wis. Admin. Code § DOC 303.24(2), which prohibits joining or soliciting others to join in any group petition or statement. Matthews has filed a Motion for Preliminary Injunction (dkt. 31), Motion for Sanctions (dkt. 54), and three motions for assistance in recruiting counsel (dkts. 52, 67, 70).

After reviewing the parties' submissions, I conclude that there are no material facts in dispute that would warrant a hearing. I am denying Mathews' motions because he has not submitted sufficient evidence that would entitle him to any of the relief he seeks.

UNDISPUTED FACTS

Mathews' claims in this lawsuit arise from one conduct report and punishment he received related to various letters that were found in his and another inmate's cell at WSPF.

---

[1] Mathews spells his last name "Mathews" in all of his filings. While DOC records indicate that his last name is spelled "Matthews," and defendants are using that spelling, because DOC rules regarding name spelling do not apply to this court, I will continue using the spelling Mathews uses for purposes of this lawsuit.

I.     **Conduct Report #2732167**

In 2015, WSPF staff found two letters in Mathews' cell. One letter, dated November 28, 2015, was directed to defendant Warden Gary Boughton. In it, Mathews wrote Boughton about "serious concerns" he had, such as his mattress being thin and old. He also asked Boughton to consider starting a weekly or monthly meeting for prison staff to address inmate concerns. Boughton responded in a letter on December 9, 2015, in which he stated that the standards at WSPF are consistent with other institutions and that WSPF meets basic needs and provides a safe environment to inmates.

The second letter staff found in Mathews' cell was dated September 27, 2015, in Mathews' handwriting and stated that the proposal was "being brought forth by the prisoners of WSPF." (DPFOF, dkt. 35, ¶ 15.) Apparently this letter has been destroyed, but defendants state that the letter used "demanding" language. (*Id.*, ¶ 28).[2]

In the course of another investigation, staff also found three letters drafted by Mathews in the cell of another inmate, Oscar Garner, a known jailhouse lawyer. One was a copy of the November 28, 2015, letter, and the second was what appeared to be a draft of the September 27, 2015, letter. The third letter was typed and dated December 21, 2015, addressed to

---

[2] Mathews recently submitted a letter in which he states that defendants' attorney informed him that defendants do not have a copy of the letter that was the subject of Conduct Report #2732167 because it was "accidentally destroyed." (Dkt. 66.) He accuses them of destroying the letter because they believed it would hurt their case and requests that I enter judgment in his favor. If a party destroys evidence in a bad faith effort to hide adverse information, a plaintiff may be entitled to sanctions or an inference that the recording contained evidence supporting the plaintiff's claim. *See Bracey v. Grondin*, 712 F.3d 1012, 1019-20 (7th Cir. 2013). Mathews has not submitted any evidence that would suggest that this is the case here, and defendants submitted declarations from DOC staff supporting the conclusion that the letters were accidentally destroyed pursuant to DOC policy. (*See* dkt. 69.) If Mathews has any evidence beyond his personal belief that the letter was *not* accidentally destroyed, then he may submit a motion for sanctions or for an adverse inference.

Captains Gardner and Brown and WSPF Administration, used the terms "we propose" and "we ask," and appeared to be drafted based on the September 27 letter. (DPFOF, dkt. 35, ¶¶ 15-16.) Defendant Captain Brown investigated these letters and submitted a declaration about them. (Brown decl., dkt. 36.) When Brown asked Mathews about it, Mathews explained that Garner was helping him craft the letter. Also during Brown's investigation of Garner, Brown found communication between the leader of the Gangster Disciples gang and Garner. (*Id.* ¶ 11.)

Based on his investigation, Brown decided that the September 27 and December 21 letters constituted unlawful group petitions because they were not written on inmate complaint forms, were not addressed to the Inmate Complaint Examiner, contained multiple issues, used demanding language, involved other inmates and had been passed between cells from Mathews to Garner. Brown also believed that the letters presented the security risk of Gangster Disciple activity because he believes that Mathews is an active member of the Gangster Disciples who has been appointed to a position to make decisions for the Gangster Disciples in general population at WSPF.

Mathews denies gang membership but he has not submitted other evidence on this point (which is unsurprising since this would involve proving a negative). For his part, Brown describes in detail how his experience brought him to his conclusion. Beyond working as a unit manager at WSPF, he has worked as WSPF's Security Threat Groups (STG) coordinator since 2003. His position involves numerous responsibilities, and as is relevant here includes:

> "tracking disruptive groups and their members in the institution and documenting their activities . . . Preparing reports regarding group and gang activities for WSPF security staff and Security Threat Group Coordinators at other DOC institutions, instructing WSPF staff regarding gang identification and gang management

3

>strategies . . ., and assessing ongoing gang activity within the institution."

>(*Id.* ¶ 3.)

In addition, since 1987 Brown has attended over 40 training sessions or meetings related to gang identification and investigations. (Brown decl, dkt. 36, ¶ 4.)

With respect to the Gangster Disciples specifically, Brown states that this group has a history of coercion, intimidation, threats, and starting disturbances. In the past, demands made by gangs presented the risk of staff and inmate assaults. Brown also states his understanding that Mathews had previously be found guilty of participating in group petitions and resistance with a leader of the Gangster Disciples, and that Mathews appeared to be continuing that type of gang activity. With that backdrop in mind, on January 13, 2016, Brown issued Mathews Conduct Report #2732167, for violating Wis. Admin. Code. §§ DOC 303.24(2) "Group Resistance and Petitions," 303.31 "Lying," and 303.47 "Possession of Contraband - Miscellaneous."

On January 19, 2016, a disciplinary hearing was held. Mathews appeared and denied being a member of the Gangster Disciples and denied the charges in the conduct report. Defendant Lieutenant Cichanowicz concluded that Brown was credible but Mathews was not. (Ray decl., Ex. 102., dkt. 37-3, at 16-18.) Lt. Cichanowicz found Mathews guilty of violating Wis. Stat. § 303.24(2), Group Resistence and Petitions. Cichanowicz sentenced Mathews to 120 days of disciplinary segregation.

**II.     Mathews' Punishment for Conduct Report #2732167**

Inmates on disciplinary separation status progress through a step program, with step 1 allowing the fewest privileges, step 2 in the middle and step 3, allowing the most privileges. Although he had been sentenced to 120 days, Mathews only stayed on disciplinary separation status for 50 days, from January 19, until March 9. He was on step 1 from January 19 to February 2, step 2 from February 3 to February 21, and step 3 from February 22 to March 9. On March 9 Mathews had an administrative confinement hearing and he was placed on administrative confinement status.

From March 9, 2016, to the present, Mathews has been housed on administrative confinement status, where he has the same privileges as inmates on step 3 disciplinary separation status. Since then, Matthew's administrative confinement status has been reviewed a total of three times, and each time the administrative confinement committee has decided to continue that status. Following Mathews's March 2016 review, the committee unanimously recommended Mathews' placement on administrative confinement based on: (1) a February 29, 2016, recommendation by Captain Primmer concluding that Mathews' presented a threat to staff, other inmates, and the security of the institution; (2) Mathews's conduct record; (3) his history of homicidal, assaultive, or other violent behavior; (4) that his presence in general population poses a substantial risk; and (5) his active gang affiliation.

The second review of his placement occurred in August of 2016. The committee again agreed that administrative confinement was necessary because: (1) Mathews's conduct record and history of violent behavior warranted placement; (2) staff had identified Mathews as being

affiliated with an inmate or street gang; and (3) the committee concluded that Mathews's presence in general population posed a risk to others. (Ex. 101 to Ray Decl, dkt. 37-1, at 5.)

On February 22, 2017 the committee again reviewed Mathews's placement on administrative confinement. The committee concluded that administrative confinement was necessary for the reasons previously stated, but this time one committee member dissented because Mathews had not been found guilty of a "gang related offense" since 2011. (Dkt. 50-1, at 1.) As a result, Warden Boughton had to review the committee's finding. He concluded that continued administrative confinement was appropriate because Conduct Report #2732167 was a "gang related offense" and the "pattern of negative behavior coupled with the recent incident of possessing materials containing demands intended to be sent to the Warden warrants placement." (*See* dkt. 50-2.)

Defendants have described the conditions and privileges available in restrictive housing. Mathews disputes some of defendants' descriptions based on his and other inmates' experiences. Here is an overview, including Mathews' points of dispute (set out in italics):

- Inmates in restrictive housing receive 5-10 hours of out of cell activity per week. Staff encourage indoor and outdoor recreation when it's available and the weather permits.
  *Mathews disputes this, claiming that he receives at most five hours of out-of-cell activity per week, that often he loses one 75-minute period for miscellaneous reasons, and that staff members don't encourage recreation.*

- Inmates on restrictive status have contact with prison personnel on a daily basis.
  *Mathews doesn't directly dispute this, but claims that these interactions are combative and/or argumentative He does not provide evidence of any specific examples of these interactions.*

- Showers are available three times a week for 20-minute periods of time.

- Temperature in all housing units stays between 68 and 72 degrees during cold weather months.

- Inmates on restrictive housing receive limited periods of time for phone calls and the opportunity for visitation through a television monitor with audio capabilities.

- Inmates on restrictive housing status receive one pair of socks, underwear, pants and shoes; one t-shirt, over shirt, and long-sleeve shirt, washcloth, towel, and pillow; and two sheets, blankets, and writing pens.

- Inmates in administrative confinement and step 3 disciplinary separation may purchase a television. Mathews owns a television and has it in his cell.

- Inmates are allowed to complete a canteen order once a week.

- Access to legal materials is obtained by scheduling time in the electronic law libraries, and inmates are allowed one hour and fifteen minutes per week unless they have a pending court deadline, which makes them eligible for an additional one hour and fifteen minutes per week.

- Inmates may participate in high school equivalency diploma programs and correspondence courses.
  *Mathews disputes the availability of the correspondence courses because he does not have the funding.*

OPINION

I.   **Motion for Preliminary Injunction (dkt. 31)**

Mathews asks this court to order him removed from administrative confinement status, which he claims is the result of the challenged conduct report. To obtain a preliminary injunction, Mathews must show that his case has some likelihood of success on the merits, that he has no adequate remedy at law and that he will suffer irreparable harm if a preliminary injunction is denied. *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). Additionally, when the

preliminary injunction is requested under the Prison Litigation Reform Act, 18 U.S.C. § 3626 (PLRA),

> [t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1).

In this case, I am denying Mathews' request for a preliminary injunction because the undisputed evidence currently before the court does not show that Mathews has some likelihood of success on his claims.[3]

A.     **First Amendment**

Mathews claims that defendants retaliated against him by punishing him for preparing his grievance. To prevail on a retaliation claim, a plaintiff must prove three things: (1) He was engaging in activity protected by the Constitution; (2) The defendants' conduct was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) The defendants subjected the plaintiff to adverse treatment because of the plaintiff's constitutionally protected activity. *Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009). Although it is clear that the

---

[3] Defendants also argue that in this case, Mathews cannot obtain injunctive relief under the PLRA because the administrative confinement committee members are not named defendants. But Warden Boughton is a defendant and he had a hand in Mathews' most recent administrative confinement status, apparently reaching his conclusion primarily based on Conduct Report #2732167. Thus, it appears that PLRA would permit the injunctive relief Mathews seeks here if he were to qualify for it.

defendants punished Mathews because of the letters, Mathews has not sufficiently established that the letters constitute protected speech.

A prison's restriction on an inmate's speech may be upheld under the First Amendment if the restriction is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78 (1987). In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors: whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; whether alternatives for exercising the right remain to the prisoner; what impact accommodation of the right will have on prison administration; and whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Id.* at 89. While a prisoner has a "general First Amendment right to criticize [prison] policies," "he must do so in a manner consistent with his status as a prisoner." *Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010).

On the record before me, and based on the first two *Turner* factors, it does not appear that Mathews' letters constitute protected speech. Mathews does not contend that the letters were permissible "group complaints," that were going to be submitted through the ICRS. Instead, Mathews argues that the letters constitute protected speech because they did not contain demands and because he was drafting them in an attempt to *prepare* a permissible group complaint. Mathews claims that he intended to submit a letter to the warden first because other inmates had done so without punishment. Mathews further avers that he is not a member of the Gangster Disciples and points out that he was never actually accused of planning or engaging in violent or disruptive behavior on behalf of the Gangster Disciples.

Mathews's arguments do not establish that the conduct report was not logically tied to a WSPF security concern. Mathews has not submitted any evidence that objectively or persuasively rebuts Brown's belief that Mathews was a member of the Gangster Disciples and that the letters were an attempt to make demands on behalf of the Gangster Disciples, which together led Brown to conclude that the letters created a serious security risk. Brown's affidavit, summarized above, establish that he has sufficient experience, training and institutional knowledge to reach these conclusions. Moreover, Mathews has not submitted any evidence beyond his own denial that would call into question Cichanowicz's conclusion at Mathews's hearing that Brown was more credible than Mathews regarding Mathews's involvement with the Gangster Disciples. (Ray decl., Ex. 102., dkt. 37-3, at 16-18.) In sum, the evidence related to Brown's opinions and conclusions sufficiently establish that the conduct report and punishment bear a logical connection to WSPF's security concerns.

Further, Mathews has an alternative method to raise the concerns voiced in the letters. Mathews could have followed the procedures for submitting a proper group complaint as he had done in the past. Mathews chose not to do so. Mathews has not explained why he did not follow that procedure. Instead, he has submitted evidence that another inmate, Nate Lindell, has previously submitted a similar letter to prison staff prior to submitting a group complaint but was not punished for it. (Lindell decl., dkt. 51.) Lindell states that he has not been punished for the letters he has submitted to Warden Boughton that included multiple issues, made requests on behalf of multiple inmates about cell assignment, and included objections about property restrictions. While Lindell's declaration supports Mathews's position, it is not enough to establish that Mathews is entitled to a preliminary injunction. First nothing in the

10

court's record suggests that Lindell's letters included language of the sort Mathews used that Brown found "demanding." More importantly, the fact that another inmate's acts went unpunished does not establish that the group complaint procedure was not available to Mathews himself. Just because Lindell might have managed to skate across thin ice without falling through doesn't mean that Mathews was excused from using the bridge to cross the pond.

Mathews cites *Jones v. Russell*, 149 F. Supp. 3d 1095, 1101-02 (W.D. Wis. 2015), as support for his position, but that decision does not convince me that Mathews' letters are protected speech. In *Jones*, the plaintiff challenged the punishment he received after prison staff confiscated an affidavit that described gang activity; plaintiff had drafted this affidavit to assist another inmate with his lawsuit. *Id.* at 1099. The court concluded that even though the affidavit contained gang-related information, the defendants could not explain how helping another inmate with a lawsuit created any sort of a security risk. *Id.* Here, however, the defendants' security concern is not so unthinkingly Pavlovian. To the contrary, the evidence suggests that Brown, by virtue of being WSPF's STG Coordinator, had learned that Mathews was actively affiliated with the Gangster Disciples, and had reason to believe that Mathews was submitting a group demand on the gang's behalf.

A more relevant case, also from this district, is *Carter v. Ziegler*, No. 14-cv-512-wmc, 2016 WL 7383754, at *8 (W.D. Wis. Dec. 20, 2016). At summary judgment, the court rejected the plaintiff's argument that a group petition sent to the warden constituted protected speech. *Id.* The court upheld the prison policy requiring that group petitions be submitted through the ICRS, reasoning that while some of the defendants' stated concerns "ring hollow," the requirement provides "oversight and structure, thereby dampening concerns about gang-like

activity." *Id.* The court further emphasized the significant difference between a group petition submitted through ICRS and a group petition submitted directly to one prison employee, in the sense that the latter "has the potential of undermining the delicate power dynamic at play in correctional institutions." *Id.* at 9.

Mathews' letter in this lawsuit was directed to multiple WSPF officials and administration rather than a single prison employee. However, Mathews acknowledges that he was writing it with the help of another inmate, and it was drafted to be from the prisoners at WSPF generally. As a result, the distinction still exists between directing letters to individuals versus the ICRS system. Regardless, I agree with the court's observation in *Carter* that the requirement that group petitions adhere to stricter standards bears a logical relationship to the prison's interest in curbing gang activity. Perhaps later in this lawsuit Mathews might discover evidence that impeaches Brown's bases for writing the conduct report, but at this point, Mathews has not established that he is likely to succeed on his First Amendment claim.

B.  **Due Process Claim**

Mathews' Fourteenth Amendment due process claim requires him to prove that: (1) he has a liberty or property interest with which the state interfered; and (2) the procedures he was afforded upon that interference were constitutionally deficient. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007). In the prison context, regulations must be sufficiently definite to give prisoners of ordinary intelligence reasonable notice of what conduct is prohibited. *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987) ("a statute which either forbids

12

or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process law"); *Toston v. Thurmer*, 689 F.3d 828, 832 (7th Cir. 2012) ("A deprivation of liberty without fair notice of the acts that would give rise to such a deprivation violates the due process clause[.]"); *see also Jones v. Russell*, 149 F. Supp. 3d 1095, 1105 (W.D. Wis. Dec. 9, 2015) (granting summary judgment in prisoner's favor after finding that policy prohibiting a similar type of petition violated due process as applied to that prisoner); *Wesley v. Grams*, No. 10-cv-459-slc, dkt. #18 (May 25, 2011) (acknowledging that where a prison policy is too vague to provide proper notice of prohibited behavior, it violates due process).

Mathews has not shown a likelihood of success on this claim because the evidence does not suggest that his continued time on administrative confinement implicates a liberty interest. In the Seventh Circuit, "a liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009). Courts in this circuit have generally concluded that short-term placements in segregation—typically less than six months—do not involve a liberty interest. Longer periods of segregation *do* require inquiry into the conditions to determine if they impose an "atypical, significant" hardship. *Id.* at 697 (citing *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (prisoners' liberty interests implicated when placed in segregation depriving them of virtually all sensory stimuli or human contact for an indefinite period of time).

As defendants point out, Mathews was placed in disciplinary separation for 50 days, which is not long enough to implicate a constitutional liberty interest. Mathews, however, does

not distinguish between his time in disciplinary separation and his time in administrative confinement, which has been continuous since March of 2016. If Mathews's elision is justified, then he is entitled to a review.

In describing his current confinement, Mathews characterizes it as "noxious, toxic, surreal in a Hieronymous-Boschian sense." (Dkt. 47, at 7.) This characterization is admirably evocative, and if the fantastical images so conjured were accurate indicators of what Mathews actually has endured at WSPF, then I would agree that Mathews has established at least a constitutional liberty interest, if not a solid claim for intercession by Saint Anthony.

However, the evidence related to the actual conditions of Mathews's confinement does not implicate due process concerns. Mathews does deal with more limitations than inmates in general population with respect to his recreational time and access to visitors, canteen, and legal and educational materials, but those limitations do not deprive him of human interaction or sensory stimuli to the extent that he has lost a liberty interest. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 742 (7th Cir. 2013) (finding no liberty interest where inmate was placed with a confrontational inmate, faced psychological problems, and had only weekly access to the shower and prison yard). Rather, the evidence shows that Mathews is able to leave his cell for at least a few hours every week; he interacts with WSPF staff every day; the clothing he receives and the temperature of his cell appear adequate; he owns and has a television in his cell; and he has at least some access to the library and legal materials. Mathews avers that he "was denied visits, phone calls, and certain publications" and suffers from severe depression and physical pain, but his submissions indicate that he has received responses from both the health and psychological services units. It thus appears that Mathews has been dealing with mental and physical health

issues, but also that he has received responses from prison staff. In sum, Mathews has not submitted sufficient evidence to suggest that his due process claim is likely to succeed.

## II. Motion for Sanctions (dkt. 54)

Mathews also asks that I sanction defendants under Fed. R. Civ. P. 11 on the ground that defendants' representations to the court have not been made in good faith. Under Rule 11(c), the court may sanction violations of Rule 11(b):

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

In imposing such sanctions courts should take care to do so only to protect the court and parties against "callous disregard for governing law or the procedures of the court." *Allison v. Dugan*, 951 F.2d 828, 834 (7th Cir. 1992).

Mathews cites several paragraphs of defendants' Answer to the Amended Complaint (dkt. 34), the Declaration of Ellen Ray (dkt. 37), and defendants' Proposed Findings of Fact (dkt. 35),

in which defendants responded that they lacked knowledge about certain of Mathews' factual allegations. Mathews has not shown that defendants' representations were either made in bad faith or outright false.

### A. Answer to Amended Complaint

Mathews challenges defendants' denials to paragraphs 15, 34, 37, 38, 40, 41, 56, 57, but none of these denials warrant sanctions. Defendants responded that they denied some or all of the allegations in these paragraphs because the allegations were vague, the defendants lacked personal knowledge, or the allegations contained incorrect information or a legal conclusion. Mathews has not submitted facts to the contrary. Rather, it appears that Mathews is frustrated by the defendants' responses, which he deems evasive at best, if not deliberately false. To persuade the court that the defendants are playing fast and loose with the truth, Mathews will need to develop evidence to establish this. He does not have that evidence at this time.

### B. Preliminary Injunction Response

Finally, Matthews claims that defendants' response to his motion for preliminary injunction violates Rule 11 in two ways. First, he attacks counsel's argument that Mathews's desired preliminary injunction is not related to his claim, but Mathews has not submitted any evidence that would suggest that defendants' argument was either made in bad faith or based on false evidence.

Second, Mathews claims that defendants' violated Rule 11 in the their proposed findings of fact (dkt. 35, ¶¶ 6, 60, 61) and the Declaration of Ellen Ray (dkt. 37, ¶¶ 9, 23, 46, 48). He submitted evidence that he contends contradicts Ray's statements that WSPF makes available

5-10 hours of out of cell activity per week for inmates in restrictive housing, and that inmates on administrative confinement and step 3 disciplinary separation receive state-issued televisions. (Ray decl., dkt. 37 ¶ 23; DPFOF, dkt. 35, ¶ 42.) To establish that Ray's statement was false, Mathews avers that he doesn't always receive that amount of out-of-cell activity per week. This dispute alone does not establish that Ray or the defendants submitted a misrepresentation that would warrant sanctions.

As to the availability of televisions, it appears that Mathews did point out an inaccuracy because defendants submitted Ray's supplemental declaration admitting that her initial declaration was incorrect. In fact, inmates may purchase television sets themselves but WSPF does not provide them. Ray further states that Mathews owns a television set and keeps it in his cell. (Ray Supp. Decl., dkt. 53, at 1.) While defendants should have gotten their facts right, it does not appear that this mistake was intentional and I will not sanction them for correcting the record.

**III.    Motion for Assistance in Recruiting Counsel (dkt. 52)**

I previously denied Mathews' request for assistance in recruiting counsel because his filings indicated that he is capable of representing himself in this matter, but I informed him that he could renew his request if he discovered that the requirements of this case exceed his capabilities. Mathews has renewed his request, reporting that: another prisoner had prepared his previous filings for him but has been moved to a different location; Mathews suffers from attention deficient disorder, which makes reading and preparing filings incredibly difficult; and Mathews has to appear for a deposition and does not understand his rights. Mathews has

17

submitted letters from two attorneys who have declined to represent him at this point in the proceedings. (Dkts. 52-1, 67-1.)

The starting point of the court's analysis is that there is no right to counsel in civil cases. *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014). Rather, a party who wants court assistance recruiting counsel must meet several requirements. *Santiago v. Walls*, 599 F.3d 749, 760-61 (7th Cir. 2010). Mathews has met the first requirement by establishing that he is unable to afford counsel because he is proceeding in this matter *in forma pauperis*.

The second requirement *pro se* litigants must fulfill is making a showing that he has made reasonable but unsuccessful efforts on his own to find a lawyer to represent him. While this court typically requires litigants to submit the names and addresses of at least three attorneys who have declined to represent them, I will accept Mathews' unsuccessful attempts with two.

Nonetheless, at this point I am declining to recruit a volunteer attorney to assist Mathews because I am not persuaded that this is one of those relatively few cases in which it appears from the record that the legal and factual difficulty of the case exceeds the plaintiff's ability to prosecute it. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007). The operative question is not whether a lawyer will do a better job than a prisoner plaintiff because that is true by definition.[4] While I am sympathetic to Mathews' report that he has difficulty studying the law, this is a frequent complaint from pro se litigants and it usually can be addressed without finding a volunteer attorney.

---

[4] As I routinely explain to inmate litigants during our telephonic preliminary pretrial conferences, the judges in this court would gladly provide a volunteer attorney to every inmate litigant if we had enough attorneys to do this, but we don't. This court gets between 250 - 300 new pro se civil lawsuits every year, most from state prisoners, against a pool of about 30 attorneys who will volunteer to take one case a year.

More to the point, Mathews has made no showing that he is unable to litigate his claims without an attorney. The only matters currently before the court are motions filed by Mathews himself. Dispositive motions are not due until September 2017, so the only task at hand is the discovery process. Following my preliminary pretrial conference with the parties, Mathews received a packet of materials that explains the discovery process. (*See* Prelim. Pretrial Conf. Order, dkt. 46). He has not explained how or why this informational packet, the Federal Rules of Civil Procedure, and the other resources available at WSPF, are not sufficient to guide him through the discovery process without an attorney. Instead, he focuses on his reliance on another inmate to prepare his submissions, but his reliance on another inmate militates against recruitment because it indicates that Mathews is using the resources available to him.

More importantly, Mathews seems more than capable of litigating this matter at this stage without an attorney. His submissions in this case have been clear and well-written with citations to relevant authority. Mathews has effectively advocated for himself without the help of an attorney, as demonstrated by his successful motion for reconsideration of my opinion with respect to his due process claim, as well as his thoroughly researched brief in support of his motion for a preliminary injunction. Finally, while Mathews may be relying on another inmate to prepare his filings, he has not explained why he cannot proceed without him, beyond reporting that he has to pay for postage in exchange for this assistance. While Mathews may be nervous about the discovery process, I am confident that he can review the federal rules of procedure and evidence to prepare and advocate for himself. As a result, I will not recruit a volunteer attorney to assist Mathews at this stage.

ORDER

IT IS ORDERED that Plaintiff Dion Mathews' Motion for Preliminary Injunction (dkt. 31), Motion for Sanctions (dkt. 54) and motions for assistance in recruiting counsel (dkts. 52, 67, 70) all are DENIED.

Entered this 17th day of July, 2017.

BY THE COURT:
/s/
STEPHEN L. CROCKER
Magistrate Judge