# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

DION MATHEWS,

                Plaintiff,

    v.

CAPTAIN LEBBEUS BROWN, *et al.*,

                Defendants.

**OPINION AND ORDER**

16-cv-650-slc

---

Pro se plaintiff Dion Mathews is proceeding in this lawsuit with claims of First Amendment retaliation and Fourteenth Amendment due process violations against employees at the Wisconsin Secure Program Facility (WSPF). Mathews's claims arise out of a WSPF conduct report charging him with violating Wis. Admin. Code § DOC 303.24(2), which prohibits joining or soliciting others to join in any group petition or statement. Defendants have filed a motion for summary judgment (dkt. 91) and a motion to strike certain filings (dkt. 110). Mathews has filed nine motions related to the summary judgment filings (dkts. 73, 129, 130, 132, 134, 135, 136, 142, 146.)

In this three-part order I first will rule on the parties' non-dispositive motions, then grant defendants' motion for summary judgment and finally address defendants' claim of qualified immunity. Here's the bottom line: the defendants are entitled to judgment on Mathews's First Amendment retaliation claim because their decision to issue a conduct report and punish Mathews for drafting the letters was a reasonable restriction on his speech under the standard set forth in *Turner v. Safely*, 482 U.S. 78 (1987). Defendants are entitled to judgment on Mathews's due process claim because, on this record, Mathews had sufficient notice that the letters he was drafting were prohibited by Wis. Admin. Code § DOC 303.24(2).

**I.    Defendants' motion to strike (dkt. 110.)**

Defendants seek to strike from the record the filings submitted by Nate Lindell in Case No. 17-cv-767. Lindell is an inmate who has been assisting Mathews in this lawsuit. Lindell has prepared the bulk of the submissions that Mathews signed. Lindell and Mathews used to be housed close to each other, but now they are in different sections of WSPF. As a result, now they have to send each other letters related to this lawsuit. At one point, Lindell submitted a filing that he intended to be filed in this case, but because Lindell asserted his own (non-existent) right to act as a jailhouse lawyer on Mathews's behalf, the Clerk of Court opened a new case to account for Lindell's claim on his own behalf. When Lindell clarified that he had intended that filing to be part of the record in *this* case, the clerk administratively closed Case. No. 17-cv-767, and re-filed Lindell's materials in this lawsuit. This seems to moot defendants' request, but I am granting the request in order to make clear to Mathews and Lindell that I have considered only materials filed in this lawsuit that are related to the claims outlined in Mathew's First Amended Complaint. I am not considering Lindell's claimed right to appear in this lawsuit on behalf of Mathews.

To the extent that Lindell and Mathews still might take issue with WSPF staff's limitations on Lindell's involvement, that would be a non-starter in this lawsuit. First, Lindell has no right to submit filings on Mathews's behalf because Lindell is not a licensed attorney. Any filings actually signed by Lindell in Mathews's lawsuit would violate Wis. Stat. § 757.30. Second, even if Mathews is asking merely to have access to Lindell's assistance, inmates have no right to have access to a particular jailhouse lawyer. *Gometz v. Henman*, 807 F.2d 113, 116 (7th Cir. 1986); *see Shango v. Jurich*, 965 F.2d 289, 293 (7th Cir. 1992).

## II.    Mathews's motions (dkts. 129, 130, 132, 134, 135, 136, 142, 146)

Mathews has filed two motions in which he asks the court to consider his late-filed summary judgment materials. (Dkts. 136, 142.) Out of fairness to Mathews's pro se status and consistent with my previous rulings that have accommodated him for that reason, I am GRANTING these motions. However, I am DENYING Mathews's remaining motions. Here's why:

### A.    Motions for Sanctions (dkts. 73, 130, 132, 134, 135)

Mathews has filed five sanctions motions, but it appears that dkts. 130 and 134 duplicate one another, and dkts. 132 and 135 duplicate one another. Here is the overview:

- Mathews seeks judgment against defendants pursuant to Federal Rule of Civil Procedures 56(f) because defendants cannot provide evidence that is essential to their case. (Dkt. 73.) In particular, he argues that because the letters that were the subject of the conduct report were accidentally destroyed, I should enter judgment in his favor. Mathews essentially is rearguing a previous sanction request that I denied because Mathews had not submitted evidence suggesting that the letters were destroyed in a purposeful attempt to avoid any adverse effects from the letters. (Dkt. 107, at 4-6.)

- Mathews argues that defendants have pursued a frivolous defense related to defendants' justification for placing Mathews in administrative confinement, and submitted misrepresentations to the court in their statements about Lindell's filings in this lawsuit. (Dkts. 130, 134.)

- Mathews claims that in defendants' summary judgment brief, AAG Paulson submitted numerous misrepresentations related to the basis of Mathews's conduct report and Boughton's involvement in the conduct report, and has submitted frivolous arguments related to the security risk posed by group petitions. (Dkt. 132, 135.)

None of Mathews's previous motions for sanctions in this lawsuit has established sanctionable conduct by AAG Paulson or the defendants. That hasn't changed in Mathews's pending motions. While Mathews may take issue with the arguments that defendants are making, or the conclusory nature of some of their arguments, he has not pointed to a clear misrepresentation or frivolous argument that warrants sanctions here. As such, I'm denying each of these motions.

### B.    Objection to Stay (dkt. 129)

Mathews objects to my order granting defendants' request for a stay of the deadlines and trial date in this lawsuit, and also requests appointment of counsel. I granted defendants' request for a stay because defendants' lawyers have reported that, because AAG Paulson needed to take an early medical leave related to her family leave, she would be unavailable for the previously scheduled February 22, 2018, trial. Now Mathews claims that this accommodation was unfair, pointing to my previous denial of his request for an extension and various alleged failures of defendants to accommodate him.

Mathews is incorrect. First, I have repeatedly accommodated Mathews's scheduling requests in this lawsuit, I just did so again with respect to his summary judgment filings. (*See* dkts. 44, 59, 88.) While I pared down *one* of Mathews's requested extensions–from three weeks to one week– I did this because I previously had granted Mathews a three week extension of the same deadline. (Dkt. 88, at 7-8.) Next, Mathews's complaint that defendants have not accommodated *him* is not directly relevant to any court scheduling decision in this case and it is completely irrelevant to the factual basis for granting defendants' request for a stay.  I granted

defendants' request because the DOJ is understaffed and AAG Paulson has been actively involved in this lawsuit since January of 2017. Mathews has not provided me a persuasive reason to reconsider that decision.

As to Mathews's request for counsel, his filings continue to be drafted by Lindell, who continues to craft thought-out and reasoned motions that Mathews has signed and submitted. Moreover, as explained above, I have considered the filings that Lindell prepared for Mathews in response to defendants' motion for summary judgment. Mathews has not explained how the circumstances have changed since I first denied his request for the assistance of a volunteer attorney. Accordingly, I am denying this motion.

### C.      Motion for Leave to File Sur-Reply (dkt. 146)

Mathews claims that defendants presented new factual issues in their reply brief to which he needs to respond. That is not an accurate characterization of the situation. Mathews is complaining about defendants' arguments related to Lindell's involvement in this lawsuit and timely-proposed findings of fact that defendants re-emphasized in their reply brief. Mathews has not pointed to an instance where defendants tried to introduce *new* evidence in their reply brief. I am denying this motion.

<u>SUMMARY JUDGMENT</u>

UNDISPUTED FACTS[1]

# I.  The Parties

Dion Mathews is incarcerated at WSPF, a maximum security Wisconsin Department of Corrections (DOC) facility, where the events at issue in this lawsuit took place. All of the defendants were employed by the DOC and worked there during the relevant time period. They are:

**Lebbeus Brown** was a Captain and WSPF's Security Threat Groups Coordinator during the relevant time period. Brown has extensive training on the identification and operation of prison and street gangs. Beyond working as a unit manager at WSPF, Brown has worked as WSPF's Security Threat Groups (STG) coordinator since 2003.  This position involves numerous responsibilities, including

> tracking disruptive groups and their members in the institution and documenting their activities . . .  Preparing reports regarding group and gang activities for WSPF security staff and Security Threat Group Coordinators at other DOC institutions, instructing WSPF staff regarding gang identification and gang management strategies . . ., and assessing ongoing gang activity within the institution.

(Brown decl (dkt. 36) ¶ 3.) Since 1987 Brown has attended over 40 training sessions or meetings related to gang identification and investigations. (*Id.* ¶ 4.)

**Joseph Cichanowicz**  was a Lieutenant at WSPF from September 2013 to May 2017.

**Michael Hanfield** is a Captain and STG Specialist at WSPF.

---

[1]  I have drawn these facts from the parties' respective proposed findings of fact and the evidence cited to in those proposed findings. The facts are material and undisputed unless otherwise noted.

**Gary Boughton** is WSPF's warden, and has held this position since March 23, 2014. Boughton has been a DOC warden since July 2010.

**Mark Kartman** is WSPF's Security Director.

**Ellen Ray** is WSPF's Institution Complaint Examiner (ICE).

## II. The DOC Group Complaint Process *versus* Prohibited Group Petitions

The DOC has written procedures that govern how inmates may submit group complaints through the Inmate Complaint Review System (ICRS). Pursuant to Wis. Admin. Code § DOC 310.09, one inmate or a group of inmates may file a complaint if the complaint:

(a) Is typed or written legibly on forms supplied for that purpose.

(b) Is signed by the inmate.

(c) Does not contain language that is obscene, profane, abusive, or threatens others, unless that language is necessary to describe the factual basis of the substance of the complaint.

(d) Is filed only under the name by which the inmate was committed to the DOC or the legal name is an inmate had a name change.

(e) Contains only one issue per complaint, and clearly identifies the issue.

Under § DOC 310.10, inmates who have a common complaint may file as a group by using one complaint form. All complainants must sign the form, and the inmates must designate a spokesperson. If a spokesperson is not identified, the first name signed on the complaint is considered the spokesperson for the group. WSPF makes complaint forms accessible to all inmates.

In accordance with Wis. Admin. Code § DOC 310.09(4), ICE may respond to a complaint by directing an inmate to attempt to resolve the issue with the appropriate staff

member before proceeding with a complaint. According to Ray, when an inmate is attempting informal resolution of an issue, he may only attempt to resolve the issue on his *own* behalf, even if the concern is raised in a group complaint with other inmates. Ray does not cite to a specific policy as to this latter requirement, and Mathews claims that this informal resolution requirement was unclear. Once ICE receives a complaint that satisfies all the filing requirements, the ICE sends the inmate a receipt acknowledgment. When ICE receives a group complaint, the spokesperson receives the receipt.

Previously, Mathews had served as the spokesperson for a group complaint submitted on March 3, 2011, and assigned number WSPF-2011-4467. In this complaint, the inmates complained about not being allowed to go outside for recreation because the recreation yard was not shoveled. Since August of 2016, Mathews has participated in four other group complaints. The parties have not provided details about Mathews's level of involvement in those complaints, but Mathews did not receive any conduct reports for his involvement in any of these five group complaints.

Mathews previously has been found guilty of violating § DOC 303.24, which prohibits "Group resistance and petitions." This policy provides that:

An inmate who does any of the following is guilty of group resistence and petitions:

(1) Participates in any group activity which is not approved by the warden or is contrary to provisions of this chapter.

(2) Joins in or solicits another to join in any group petition or statement. The following activities are not prohibited:

(a) Authorized activity by groups approved by the warden.

(b) Group petitions to the courts.

> (c) Complaints properly prepared under ch. DOC 310.

> (3) Participates in any activity associated with any security threat group or possesses any written materials, symbols or symbolism related to a security threat group.

In 2010, Mathews received a conduct report for engaging in group resistance, in violation of a prior iteration of this policy, Wis. Admin. Code § DOC 303.20(2), which also prohibited inmates from joining or soliciting other to join in a group petition or statement. Mathews had been caught trying to make copies of a letter that was signed by another inmate, directed to the warden, and included requests made by "AC prisoners" (prisoners on administrative confinement) that asked the warden to allow inmates to possess more property items while in administrative confinement. Mathews's defended against the conduct report by claiming that he was attempting to resolve the issues informally. Mathews was found guilty of engaging in group resistance and petitions because there was evidence that Mathews was working with other inmates to make demands outside the requirements of the ICRS process. (*See* Ex. 104 to Ray decl. (dkt. 37-5) at 4.)

## III. The Gangster Disciples

In his declarations, Lebbeus Brown provides background information about the Gangster Disciples (a/k/a GD and GDN), a violent and organized gang that has been in existence since the 1970s.[2] According to Brown, the national chairman is Larry Hoover, who currently is

---

[2] Mathews attempts to dispute defendants' proposed findings of fact related to the Gangster Disciples by arguing that this information is not relevant to his conduct report and by challenging Brown's background knowledge. This information is relevant because defendants' position is that DOC's knowledge and perception of Mathews's involvement in the Gangster Disciples was intrinsic to Brown's decision to issue the challenged conduct report. On a more pragmatic level, Mathews has not submitted any evidence that actually contradicts Brown's perceptions about the Gangster Disciples or that refutes the defendants' evidence that led them to link Mathews to the organization. Keep in mind that Mathews's disavowal of

imprisoned in a federal prison in Colorado. Gangster Disciples are involved in a variety of criminal activities (including drug sales and murder) that often are the target of investigations by the FBI as well as federal and state prison security officers.

According to Brown, there are 95 known Gangster Disciples housed at WSPF, out of an average daily inmate population of 437.[3] Gangster Disciples present a high safety risk due to their history of coercion, intimidation, threats, and starting disturbances within the prison. Specifically, Gangster Disciples violate DOC policies through extortion, fighting, gambling, and disciplining their own members with fines and physical confrontations.

Brown's understanding is that Glenn Turner is WSPF's known Gangster Disciples leader. Staff at WSPF know that Turner is in contact with Hoover's immediate subordinates in the federal prison system. According to Brown, Turner communicates with federal prisoners by using a woman in Colorado (whom he names) who believes that she is helping Turner's mission to end solitary confinement. Yet, also according to Brown, Turner has duped this woman and is using her to pass letters to other Gangster Disciples.

## IV. WSPF's View of Mathews's Involvement with the Gangster Disciples

Mathews denies membership or involvement with the Gangster Disciples. The evidence he cites in support are his own statements and those of Turner, whose affidavit Mathews submitted along with his first amended complaint (Turner decl. (dkt. 16-6) at 1-2).

---

Gangster Disciple membership, *infra* at 10, does not create a genuine factual dispute as to what the defendants *believed* and why they believed it.

[3] *See* Institution Fact Sheet at https://doc.wi.gov/pages/offenderinformation/adultinstitutions/ wisconsinsecureprogramfacility.aspx.

Brown holds a different view and sets forth his position. Brown has concluded that Mathews has been affiliated with the Gangster Disciples since Mathews arrived at WSPF in 2006. Brown has concluded that Mathews is a designated decision-maker for Gangster Disciples inmates housed in general population. Brown reached these conclusions based on Mathews's conduct reports for gang-related activity and his repeated association with other known members of the Gangster Disciples. These are the two main factors considered that WSPF staff use in confirming an inmate's affiliation.

More specifically, Brown knows that Mathews and Turner communicate in prison because staff previously confiscated correspondence between them. In 2011, Captain Gardner, another WSPF employee with knowledge of the Gangster Disciples operations at WSPF, issued Mathews a conduct report based on a letter Mathews wrote to Turner discussing how Gangster Disciples business should be carried out related to investigation into and sanctions imposed on inmates. (Ex. 103 to Ray decl. (dkt. 37-4) at 5-6.) Further, Brown explains that his information shows that WSPF inmate Zachary Hayes–who is a relevant actor in the instant lawsuit–is an active member of the Gangster Disciples who follows Gangster Disciples leadership without question. WSPF staff had also learned that there were communications between Turner and another inmate, Oscar Garner, because many of Turner's communications referenced "St. Louis," which is Garner's nickname.

## V. November 28, 2015 Letter to Warden

On November 28, 2015, Gary Boughton's office received correspondence from Mathews. In it, Mathews wrote Boughton about "serious concerns" he had, such as his mattress being thin and old and a desire for higher educational opportunities. Mathews also asked Boughton to consider starting a weekly or monthly meeting for prison staff to address inmate concerns. Boughton responded in a letter on December 9, 2015, in which he stated that the standards at WSPF are consistent with other institutions, and that WSPF meets basic needs and provides a safe environment to inmates.

Boughton explains that his office receives correspondence from inmates every business day, and that he is aware that inmates are sending him correspondence in attempts to informally resolve a complaint prior to filing an inmate complaint through the ICRS. Boughton acknowledges that if Mathews had not been satisfied with his December 9 response letter, Mathews could have submitted an inmate complaint. At his deposition, Mathews explained that he showed his November 28, 2015, letter to another inmate, Oscar Garner, to help him write a better version to send to Brown and Gardner.

## VI. December 2015 Investigation

As a backdrop, Brown explains that during the relevant time period, WSPF staff had learned through mail monitoring that Turner wanted to draw attention to the conditions of solitary confinement at WSPF. Brown believed that the Gangster Disciples were organizing some type of disturbance to gain media attention, and that because Turner was in restrictive housing, Turner was using Mathews and other inmates to accomplish this goal.

On or around December 22, 2015, Brown and Gardner saw Hayes on a surveillance video in the Charlie Unit; Hayes was not authorized to be in this area. They saw Hayes talking at Mathews's cell door and at Garner's cell door. Later, staff also saw Mathews in a different range's day room talking to other inmates; Mathews was not authorized to be in this area. As a result of these observations, Hayes and Mathews were placed in Temporary Lockup (TLU) pending an investigation of their activities.

When Hayes was being transported to TLU, staff conducted a pat search and found gang literature in his shoe that included the following language:

- "We believe in the teaching of our honorable Chairman and all the laws and policies set forth by our chairman and his executive staff."

- "We the brothers of the struggle pledge whole heartedly our love, life and loyalty having embraced the teaching of our honorable chairman."

- "So that this GDN can live on forever. So righteous GDN."

(Brown 2nd decl. (dkt. 95) ¶ 14.)

As a result of Hayes's behavior and the discovery of these Gangster Disciples-related materials, Hayed was issued Conduct Report #2732138. Hayes was found guilty of Group Resistance and Petitions and Possession of Contraband - Miscellaneous, in violation of Wis. Admin. Code §§ DOC 303.24(3), 303.47(2).

Because WSPF staff had found gang literature on Hayes, they conducted cell searches of the other inmates to whom Hayes had been seen talking on the surveillance video. Mathews's cell was searched the same day, December 22. Staff first removed questionable property from Mathews's cell, then Brown searched it. One item Brown reviewed was an envelope from the woman in Colorado who was relaying communications between Gangster Disciples in different

federal prisons. Brown also reviewed two letters handwritten by Mathews. One letter was the November 28, 2015, letter Mathews wrote to Boughton. The second letter, in Matthews's handwriting and dated September 27, 2015, stated that the proposal was "being brought forth by the prisoners of WSPF."

Gardner and Brown interviewed Mathews about his letters. Mathews explained that the September letter was a draft for the complaint he was writing to Boughton; he asked Gardner and Brown how he was supposed to resolve the issue so that he could file a group complaint, but neither Gardner nor Brown responded. When Brown specifically asked Mathews why the draft was from the prisoners of WSPF, Mathews responded that he was the only one involved with the letter. According to Mathews, Brown called him a liar, at which point Mathews refused to answer any more questions and tried to leave. (Mathews's decl. (dkt. 139) at 2.)

At Mathews's deposition in this lawsuit, he testified that no other prisoners knew that he was working on the September letter. Mathews claims that the September letter was an expanded version of the letter he previously had sent to Boughton. Mathews now characterizes his September 2015 letter as a proposal that he hoped would "bridge a communication" between inmates and WSPF's administration. (Mathews decl. (dkt. 119) ¶ 1; Mathews dep. (dkt. 90) at 31:2-4.) Mathews admits that the letter was *not* intended to be a draft group complaint.

As a result of Garner's apparent communications with Hayes, Mathews, and Turner, WSPF staff searched Garner's cell on December 28, 2015. Brown found three letters in Garner's cell:

   (1)  A copy of Mathews's November 28, 2015, letter to Boughton.

   (2)  The September 27, 2015, letter that had been found in Mathews's cell, this version labeled "Rough Draft" and addressed to "Captain

14

> Gardner/Brown/ Administration WSPF from all concerned prisoners at WSPF."
>
> (3) A typed letter dated December 21, 2015, and addressed to Gardner, Brown, and WSPF Administration, and "From: the prisoners of WSPF."

Brown states that the December 21, 2015, letter appeared to be based off the September 27 rough draft, and contained the terms "we propose" and "we ask."

Brown interpreted the language in the December 21 letter to be demands. When Brown discussed the letters with Garner, Garner told him that he had received the letters from Mathews. Garner further explained that Mathews wanted Garner to review the letters and make them sound better because Garner did a lot of legal work for other inmates. Brown understands that inmates may assist each other with legal work, but he believed that Garner was assisting Mathews with impermissible activity.

## VII. Conduct Report #2732167

Based on his investigation, Brown decided that the September 27 and December 21 letters constituted unlawful group petitions. On January 13, 2016, Brown issued Mathews Conduct Report #2732167, for violating Wis. Admin. Code. §§ DOC 303.24(2) "Group Resistance and Petitions," 303.31 "Lying," and 303.47 "Possession of Contraband-Miscellaneous."

When Brown issued these conduct reports, he believed that Mathews had violated DOC policies and that Garner was culpable for his involvement in drafting the letters. Here are the reasons why Brown believed that the September 21 and December 21 letters were not proper group complaints:

15

(1) The letters were not written on inmate complaint forms.

(2) The letters were not addressed to ICE, and instead were addressed to "WSPF Administration," Gardner, and Brown.

(3) The letters contained multiple issues, while ICRS complaints are limited to one issue per complaint.

(4) The letters used demanding language instead of simply stating complaints.

(5) The letters involved other inmates and had passed between cells, from Mathews to Garner, which support the conclusion that they was part of a group petition.

(6) WSPF viewed Mathews as a known high-ranking member of the Gangster Disciples.

Brown also knew at the time he issued the conduct reports that Mathews had received two other conduct reports for similar activity from other WSPF staff.

Brown did not believe Mathews's claim that the letters were informal attempts to resolve an issue. First, Brown did not believe that the September and December letters were expansions of the November letter that Mathews wrote to Boughton because the September and December letters were not addressed to Boughton, and the November letter did not include any language suggesting that it was from WSPF prisoners. Next, Brown did not believe the December 21 letter was an informal attempt to informally resolve the issues raised in the November letter because informal resolution letters are usually directed to individuals; in light of Boughton's response to the November letter, Mathews already had completed the informal resolution prerequisite to filing a proper complaint. Brown believed the December 21 letter served a wholly different purpose than the November letter to Boughton. Finally, the September and December letters were not signed by an individual. Typically when correspondence is submitted by unnamed

inmates, staff view it as threatening because the perception is that the senders are attempting to hide their identity.

Additionally, Brown deemed it significant that the September and December letters were directed to him and Gardner, who routinely address STG issues but rarely address issues regarding conditions of confinement. Therefore, when Brown saw his name and Gardner's name on the letters, he surmised that Mathews was trying to speak on behalf of his gang without saying so, because gang members rarely explicitly refer to gang affiliation. All of these factors led Brown to believe that the September and December letters were signs that an organized disturbance might be in its planning stages.

## VIII.  Disciplinary Hearing

Pursuant to Wis. Admin. Code § DOC 303.68, the Security Director reviews all conduct reports that are not uncontested minor violations.  This would include Conduct Report #2732167 against Mathews. On January 13, 2016, Security Director Kartman reviewed the conduct report and permitted it to proceed as a major offense because the charged conduct had the potential to create a serious disruption at the facility. Mathews received a copy of the conduct report that day.

On January 19, 2016, a disciplinary hearing was held.  Defendant Lieutenant Cichanowicz was the hearing officer. In addition to the conduct report itself, Cichanowicz received four types of evidence:

> (1) Mathews's in person oral statement denying both membership in the Gangster Disciples and the charges in the conduct report, but admitting giving Garner the letters, which he claimed were an

attempt to informally resolve a complaint prior to filing a group complaint.

(2) The confiscated letters found during the cell searches.

(3) The DOC-2366 "Review of Conduct Report/Evidence Related to Security Threat Groups," a form that the STG Specialist, Captain Michael Hanfeld, completed that verified that the evidence supported the charge that Mathews's conduct involved STG activity because of Mathews's affiliation with the Gangster Disciples, the history of the Gangster Disciples' criminal activity, and that Mathews's history of being found guilty of this type of conduct suggested that this conduct was ongoing. (Ex. 102 to Ray decl. (dkt. 37-3) at 26.)

(4) Witness testimony from two inmates, Turner and Garner, who were permitted to respond to written questions that Mathews submitted.

After reviewing all of the evidence, Cichanowicz found Mathews guilty of violating Wis. Stat. § 303.24(2), Group Resistence and Petitions, but he dismissed the Lying and Possession of Contraband charges for insufficient evidence. That same day, Cichanowicz filed his written decision. He explained that it was more likely than not that Mathews had participated in a group petition because he admitted he wrote the letters and had passed them to another inmate, and because the evidence supported the finding that the letters were not drafted in a manner that would allow them to proceed through the ICRS. Cichanowicz also concluded that Brown was credible but Mathews was not. (*Id.* at 16-18.) Cichanowicz imposed a sentence of 120 days of disciplinary segregation.

Brown was not involved in the conduct report process, and Mathews did not request Brown's appearance or testimony at the hearing.

On January 28, 2016, the warden's office received Mathews's appeal of the disposition of Conduct Report #2732167. Deputy Warden Dan Winkleski, not Warden Boughton,

decided the appeal. Winkleski affirmed Cichanowicz's decision, finding that the disposition was appropriate and did not suffer from procedural errors. Boughton was not involved in reviewing the evidence related to Conduct Report #2732167 nor whether the hearing provided Mathews with all process due.

## IX.  Mathews's Inmate Complaint, WSPF-2016-4961

On March 8, 2016, ICE received a copy of Mathews's inmate complaint, WSPF-2016-4961, in which Mathews challenged Conduct Report #27321267 on the ground that Brown had lied and Winkleski had improperly denied his appeal. On March 21, 2016, ICE Ray rejected Mathews's complaint, stating that Mathews's complaints were outside of the scope of the ICRS process, citing to Wis. Admin. Code § DOC 310.08(a), which permits inmates to use the ICRS process to challenge conduct report procedures, but not to challenge the validity of evidence presented at the hearing or the discretion exercised by staff.

Mathews submitted a request for review of his rejected complaint to the warden's office. Boughton received the request for review on March 24, 2016, marking Boughton's first personal involvement in Conduct Report #2732167. Boughton reviewed Mathews complaint and agreed that Ray's rejection was proper because he understood Mathews to be attempting to resolve an issue beyond the scope of ICRS.

## X.  Oscar Garner's Conduct Report

Garner also received a conduct report for his involvement in helping Mathews draft a group petition and similarly was found guilty of violating Wis. Admin. Code §§ DOC 303.24

and 303.47. Garner received 120 days of disciplinary segregation. However, before Garner received the written disposition of his conduct report, Garner sent the warden's office a letter in which he asked Boughton to review the conduct report because Brown, a witness Garner requested to appear and who was approved to appear, did not actually attend the hearing.

When Boughton receives requests similar to Garner's, Boughton has the discretion to either affirm the conduct report hearing's disposition, hold a re-hearing, or dismiss the conduct report completely. Boughton reviewed the conduct report materials and discovered that Brown did not attend the hearing because Brown was not scheduled to work that day. Because an inmate may have the reporting staff member testify as a witness at his disciplinary hearing, Boughton concluded that disposition of Garner's hearing was procedurally deficient. Accordingly, Boughton dismissed the conduct report and disposition in an exercise of his discretion. Boughton did this because he believed that it would be unfair to Garner to require a re-hearing, not because he believed Garner was not guilty of the charges in the conduct report.

## XI. Mathews's Time in Disciplinary Separation and Administrative Confinement

Although he had been sentenced to 120 days, Mathews only stayed on disciplinary separation status for 50 days, from January 19, until March 9. Inmates on disciplinary separation status progress through a step program, with step 1 allowing the fewest privileges, step 2 in the middle and step 3, allowing the most privileges. Mathews was on step 1 from January 19 to February 2, step 2 from February 3 to February 21, and step 3 from February 22 to March 9. On March 9 Mathews had an administrative confinement hearing and he was placed on administrative confinement status.

From March 9, 2016, until September 18, 2017, Mathews was housed in administrative confinement status, where he had the same privileges as inmates on Step 3 disciplinary separation status. Mathews was placed there as a result of a March 9, 2016, decision by the Administrative Confinement Review Committee (the Committee). Before Mathews's release back into general population on September 18, 2017, the Committee reviewed his status on three other occasions, concluding at each point that a number of factors, including Conduct Report #2732167, warranted continuing Mathews in administrative confinement status.

The committee that conducted Mathews's first review consisted of non-defendants Broadbent, Sebranek and Eck. They unanimously recommended Mathews's placement on administrative confinement based on: (1) a February 29, 2016, recommendation by Captain Primmer concluding that Mathews presented a threat to staff, other inmates, and the security of the institution (*see* Ex. 101 to Ray decl. (dkt. 37-1) at 36); (2) Conduct Report #2732167; (3) Mathews's history of homicidal, assaultive, or other violent behavior; (4) Mathews's presence in general population posed a substantial risk; and (5) Mathews's active gang affiliation. (*Id.* at 30.)

The second review of Mathews's placement in administrative confinement occurred in August of 2016. Prior to the review, Brown submitted a recommendation of continued administrative confinement placement. (*Id.* at 12.) The committee, this time consisting of non-defendants Broadbent, Lemieux, and Fischer, concluded that administrative confinement was necessary because of: (1) Mathews's conduct record (specifically referencing Conduct Report #2712167); (2) Mathews's history of violent behavior; (3) His affiliation with a street gang; and (4) Mathews's presence in general population posed a risk to others. (*Id.* at 5.)

On February 22, 2017, the committee again reviewed Mathews's placement on administrative confinement. The committee, this time consisting of Broadbent, Hoem, and Finnell, was *not* unanimous in recommending continued administrative confinement placement. Hoem believed that Mathews had not been found guilty of a "gang related offense" since 2011. (Dkt. 50-1, at 1.) As a result of the split vote, Warden Boughton had to review the committee's finding. He concluded that continued administrative confinement was appropriate because Conduct Report #2732167 was, in fact, a "gang related offense" and the "pattern of negative behavior coupled with the recent incident of possessing materials containing demands intended to be sent to the Warden warrants placement." (*See* dkt. 50-2.)

Finally, on September 6, 2017, the committee again had a dissenting member, leaving Boughton to determine Mathews's placement. On September 18, 2017, Boughton ordered that Mathews be released from administrative confinement because Mathews "has not received any additional conduct reports during the last 18 months." (Mathews decl. (dkt. 139) ¶ 8; Ex. 406 (dkt. 139-6.)).

While in administrative confinement status, Mathews received the same privileges as inmates on Step 3 disciplinary separation status. Here is a summary of those privileges, with Mathews's disputed facts italicized:

- Inmates received 5-10 hours of out of cell activity per week. As to recreation in particular, staff made efforts to provide inmates with two 75-minute period of out of cell recreation per week.
  *Mathews claims that he received at most five hours of out-of-cell activity per week, and that lockdowns and/or bad weather often precluded him from receiving those 5 hours.*

- Inmates have contact with prison personnel on a daily basis when meal trays and medications are handed out and when staff pass by cells during inmate transport.

     *Mathews doesn't directly dispute this, but claims that these interactions were combative and/or argumentative.*
- Showers are available three times a week for 20-minute periods of time. Temperature in all housing units stays between 68 and 72 degrees during cold weather months.

- Inmates receive one to three 15 minute calls per month, depending on their step. They also received one hour of video visitation per week. According to Mathews, some inmates are permitted face-to-face visits while in restrictive housing, but Mathews never received such a privilege, and his family members stopped visiting due to the "poor quality" of the visits.

- Inmates on restrictive housing status receive one pair of socks, underwear, pants and shoes; one t-shirt, over shirt, and long-sleeve shirt, washcloth, towel, and pillow; and two sheets, blankets, and writing pens. Mathews does not directly dispute this but complains that he did not have access to most of his personal property, including personal clothing, his electric razor, dietary supplements, gym shoes, stapled publications, and hard cover books.

- Inmates in administrative confinement and Step 3 disciplinary separation may purchase a television. Mathews owns a television and had it in his cell.

Mathews includes additional facts related to the effect of his time in administrative confinement on his mental and physical health. Mathews claims that he was diagnosed for the first time in his life with depression. Mathews also avers that the other inmates in restrictive housing engage in offensive an disruptive conduct, including: cussing at and threatening other prisoners and staff; smearing and/or throwing feces or urine; scratching, cutting, and suicide attempts; and pounding in their cells to stop others from sleeping. Finally, because of Mathews's complaints that his Gastroesophageal Reflux Disease (GERD) had been exacerbated due to

stress, he has gone to the hospital for tests on several occasions, and has been working with a specialist and taking medication to address his symptoms. Mathews claims that the medication, Nexium, is known to increase the patients' risk of death, but he does not include evidence that he's suffered an adverse reaction to it.


## OPINION

Defendants seek summary judgment, first because Mathews's First Amendment and Due Process claims fail on their merits and also because qualified immunity shields them from money damages here. Defendants Ray and Boughton argue that neither of them was sufficiently involved in the events comprising the retaliation claims to hold them liable for it. I will address this last argument first, then turn to the merits of Mathews's First Amendment and due process claims.

As laid out above, neither Ray nor Boughton was involved in the December 2015 investigation of Mathews, in writing Conduct Report #2732167, in Mathews's disciplinary hearing, or in resolving Mathews's appeal of Cichanowicz's disposition following the hearing. Ray and Boughton became involved in Conduct Report #2732167 only after the fact and then in a limited fashion: Ray rejected Mathews's complaint about the proceedings (WSPF-2016-4961) on March 8, 2016, and Boughton affirmed Ray's decision on March 24, 2016, well after the January 2016 conduct report and disciplinary hearing.

To the extent that Mathews is challenging the actual decisions that Ray and Boughton made in March of 2016, this challenge fails as a matter of law. Ray was simply carrying out her responsibilities as ICE to comply with Wis. Admin. Code § DOC 310.08(a), and Boughton's review was merely to determine whether Ray's decision was proper. These acts are not a basis

for § 1983 liability because their roles were limited to handling his grievance. "Ruling against a prisoner on an administrative complaint does not cause or contribute to the constitutional violation." *McGee v. Adams*, 721 F.3d 474, 485 (7th Cir. 2013), *quoting George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007); *Owens v. Hinsley*, 635 F.3d 950, 953-54 (7th Cir. 2011) (same).

Mathews argues that both defendants could have / should have stepped in to correct the alleged misconduct by the other defendants, but the record does not show that either Ray or Boughton was in a position to do so. For starters, Mathews contends that Boughton could have prevented the disciplinary action, but Mathews has not submitted any evidence suggesting that Boughton even knew about it in January of 2016. Similarly, while Mathews claims that Ray failed to properly evaluate the materials that Mathews submitted along with WSPF-2016-4961, the record related to Ray's review of the complaint establishes that she made her decision on March 9, 2016, also after the conduct report and disciplinary proceeding. In other words, there is no basis for the court to find that Ray was aware in January 2016 of the acts about which Mathews was complaining in his March 2016 complaint.

Summary judgment is the "put up or shut up" moment in a lawsuit: for Mathews to survive Ray's and Boughton's motion, he must point to evidence on which the jury could reasonably find in his favor. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). He hasn't done so. Mathews's argues that Boughton was Winkleski's superior, but that's not enough: § 1983 does not recognize liability under a theory of respondeat superior. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009). Mathews has presented no evidence that Ray or Boughton was involved in the conduct that gave rise to his First Amendment and due process claims. None of the other evidence would permit an inference that either Ray or Boughton was involved in the any of the events leading up to the conduct report against Mathews or the

subsequent disciplinary hearing. Accordingly, I am granting defendants' motion for judgment in Ray's and Boughton's favor.

## I.      Mathews's First Amendment Claim

Mathews claims that defendants retaliated against him by punishing him for preparing his grievance. To prevail on a retaliation claim, a plaintiff must prove three things: (1) He was engaging in activity protected by the Constitution; (2) The defendants' conduct toward plaintiff was sufficiently adverse that it would deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) The defendants subjected the plaintiff to this adverse treatment because of the plaintiff's constitutionally protected activity. *Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009). The parties do not dispute that the defendants punished Mathews because of the letters, so this claim turns on whether the two letters that were the subject of Conduct Report #2732167 qualify as activity protected by the Constitution.

A prison's restriction on an inmate's speech may be upheld under the First Amendment if the restriction is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78 (1987). In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors: whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; whether alternatives for exercising the right remain for the prisoner; what impact accommodation of the right will have on prison administration; and whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Id.* at 89. While a prisoner has a "general First Amendment

right to criticize [prison] policies," "he must do so in a manner consistent with his status as a prisoner." *Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010).

The parties litigated this question extensively with respect to Mathews's motion for a preliminary injunction. I concluded on the record at that point that Mathews was unlikely to succeed on his First Amendment claim mainly based on the first *Turner* factor. (Preliminary Injunction Order, dkt. 77.) On the more complete record now presented to the court, I remain unconvinced that Mathews's letters constitute protected speech. I will address each of the *Turner* factors with an emphasis on the first. *See Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010)(the first *Turner* factor "can act as a threshold factor regardless of which way it cuts" ; *Jones v. Russell*, 149 F. Supp. 3d 1095, 1100 (W.D. Wis. 2015) (acknowledging that the first factor's weight is "particularly heavy" and often dispositive for the party it favors).

### A.  Rational Relationship to a Legitimate Government Interest

As an initial matter, I accept that the defendants have an interest in avoiding group petitions, an activity widely recognized as problematic in the prison context. *Watkins*, 599 F.3d at 797 ("advocacy on behalf of his fellow inmates made Watkins's complaints particularly disruptive to [defendant's] legitimate policy interests"); *see also Kuslits v. Stoudt*, No. 15-cv-809-BBC, 2016 WL 1248995, at *2 (W.D. Wis. Mar. 29, 2016) ("courts have consistently upheld prison regulations limiting group action by prisoners"); *Carter v. Ziegler*, No. 14-cv-512-wmc, 2016 WL 7383754, at *8 (W.D. Wis. Dec. 20, 2016) (emphasizing the distinction between a permissible group petition submitted through ICRS and a group petition submitted directly to one prison employee, in the sense that the latter "has the potential of undermining the delicate power dynamic at play in correctional institutions").

In support of his contention that his letters were proper, Mathews claims that there is no evidence to support Brown's conclusion that Mathews is a member of the Gangster Disciples, and that Conduct Report #2732167 didn't actually charge Mathews with gang membership or include allegations suggesting that Mathews had attempted to garner support for his letters from other inmates. Mathews argues that the information about the Gangster Disciples and the facts that Brown considered when he issued the conduct report were a smokescreen intended to obscure the fact that there was no basis for finding Matthews guilty of the conduct report.

As a matter of procedure, Mathews is incorrect. Brown was entitled to view all of the facts before him—including facts that appear innocent in isolation—as a whole. "[I]t is wrong to view items of evidence in isolation when they point in the same direction." *Mataya v. Kingston*, 371 F.3d 353, 358 (7th Cir. 2004) (citation omitted). As the court observed in *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006), in the context of determining the existence of discrimination, the case can be made "by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction." *See also District of Columbia v. Wesby*, ___ S. Ct. ___, 2018 WL 491521 (Jan. 22, 2018) (in the context of determining probable cause, "[o]ur precedents recognize that the whole is often greater than the sum of its parts – especially when the parts are viewed in isolation.") (citing *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). So, let's consider the evidence and the use that Brown made of it:

The critical dispute is whether the defendants could have/should have concluded that Mathews was affiliated with the Gangster disciples. Mathews has consistently disavowed membership in or affiliation with the Gangster Disciples. Mathews points out that the

defendants do not have any direct evidence of his membership in the Gangster Disciples; he suggests that nothing short of a letter from him admitting that "I'm a leader of a gang" would suffice to establish his GDS affiliation . (Pl. Opp. Br. (dkt. 137) at 27.) Obviously, defendants do not possess such a letter, but they don't need it. The Rule 56 analysis of defendants' summary judgment motion does not hinge on whether the parties genuinely dispute whether Mathews is connected to the Gangster Disciples. The operative question is whether the defendants had a reasonable basis for *believing* that Mathews was connected to the gang when finding him guilty of the conduct report. *Singer*, 593 F.3d at 536-37 (in determining whether plaintiff has met his burden with respect to the first prong of *Turner*, the "question is whether the prison officials are rational in their belief that, if left unchecked, [the restricted activity] could lead to gang behavior among inmates and undermine prison security in the future."). As discussed below, they did.

As a starting point and backing up a step, it is Mathews's burden to establish that his letters were constitutionally protected. *Woods v. Comm'r of the Ind. Dep't of Corr.*, 652 F.3d 745, 748 (7th Cir. 2011) ("The burden is not on the [DOC] to prove the validity of the regulation; rather, it falls to the inmates to disprove it."). Even so, defendants have submitted substantial and undisputed evidence that Brown, who wrote the conduct report, had a reasonable factual basis to believe that Mathews was in the process of preparing an improper group petition. This segues to the second point: "courts owe substantial deference to the professional judgement of prison administrators." *Koutnik v. Brown*, 456 F.3d 777, 785 (7th 2006) (quoting *Beard v. Banks*, 548 U.S. 521, 530 (2006)). This is particularly true in the context of investigating and analyzing gang activity within a prison, since gang affiliations are dynamic, and thus best assessed by prison staff who are uniquely positioned and suited to make these determinations

based on their daily observation of and interaction with their prisoners. *Koutnik*, 456 F.3d at

785. As the Court explained in *Beard*,

> We recognize that at [the summary judgment] stage we must draw
> all justifiable inferences in Banks' favor. In doing so, however, we
> must distinguish between evidence of disputed facts and disputed
> matters of professional judgment. In respect to the latter, our
> inferences must accord deference to the views of prison authorities.
> Unless a prisoner can point to sufficient evidence regarding such
> issues of judgment to allow him to prevail on the merits, he cannot
> prevail at the summary judgment stage.

*Beard*, 548 U.S. at 529-30 (citations omitted).

Brown did not offhandedly reach his conclusions based on guesswork or a hunch. Brown

brought to the December 2015 investigation several decades of training and experience

identifying gang activity. WSPF has recognized Brown's qualifications by employing him as the

facility's STG coordinator since 2003. Put simply, it is Brown's job is to ferret out potential

gang activity and thwart it. Accordingly, Brown was in a position to conclude that Mathews and

Hayes both were active members of the Gangster Disciples when the letters were written, *and*

that the letters were an effort to carry out a goal of the Gangster Disciples. The information that

Brown had gathered–and which Mathews does not dispute at the summary judgment stage–

regarding Mathews, Garner, Hayes, the Gangster Disciples, and the events observed by WSPF

staff in December 2015, created a logical path to Brown's conclusion that Mathews was

preparing an impermissible group petition.

First, Brown knew that Hayes was a member of the Gangster Disciples. Next, although

Brown was aware that Mathews denied Gangster Disciple affiliation, Brown concluded otherwise

based on all of the other evidence known to him. Brown was aware that Mathews had received

conduct reports for gang-related activity; that Mathews repeatedly associated with Gangster

Disciples at WSPF; and that staff had found a letter from the woman fostered and facilitated communications between Gangster Disciples across the country in Mathews's cell. This evidence included a 2011 incident in which Mathews received a conduct report for communicating with Turner, WSPF's known Gangster Disciple leader, about gang activity. As already noted, Mathews's only contrary evidence in this lawsuit is his own statements and those of Turner, but as these denials do not call into question Brown's sincerely held and factually reasonable opinion about Mathews's GDS membership or the objective fact that Mathews had previously been punished for being involved with the Gangster Disciples.

Second, in December 2015, Brown and other WSPF staff knew that the Gangster Disciples were attempting to call attention to WSPF's solitary confinement conditions. They also knew that, because Turner was in restrictive housing, it was likely that another inmate would be carrying out those efforts on Turner's behalf. In Brown's view, Mathews was that other inmate.

Third, the chain of events beginning on December 22, 2015 and ending with the January 19, 2016 disciplinary hearing, confirm that the defendants' actions genuinely were a response to a perceived security threat. On December 22, Brown and other staff saw Hayes enter an off-limits unit to speak to both Mathews and Garner, then found Gangster Disciple literature in Hayes's shoe, and then saw Mathews in an unauthorized area as well. It was reasonable for Brown to conclude that Hayes was acting on behalf of the gang. This led to the cell searches that uncovered information that Brown reasonably believed pointed to a planned group petition involving the Gangster Disciples: in Mathews's cell staff found the September 27 letter and an envelope from the woman from Colorado. In Garner's cell staff found the same September 27 letter, this one labeled "Rough Draft," and addressed to "Captain Gardner/Brown/

Administration WSPF from all concerned prisoners at WSPF," and a typed letter dated December 21, and addressed to Gardner, Brown, and WSPF Administration, "From: the prisoners of WSPF." According to Brown, this letter included the phrases "we propose" and "we ask."

Taking all of this together Brown had sufficient information from several sources that, when considered together, permitted a reasonable belief that some type of unpermitted group activity either was occurring or being planned. Brown knew that Mathews was communicating with Hayes and Garner (both connected to the Gangster Disciples) and that it was likely that Mathews was communicating with Gangster Disciples in other prisons. Brown knew that both Mathews and Garner *at least* knew about a letter in which multiple WSPF inmates were complaining to several different WSPF staffers–but not the warden–about conditions, and it would not have been unreasonable for Brown to infer that Hayes knew it too. While I cannot review the letters because a WSPF employee accidentally destroyed them,[4] Mathews does not dispute that they included the language quoted above, which Brown interpreted to be demands. The letters also raised a red flag in Brown's mind because the they were addressed to him and to another STG officer, not to Warden Boughton, as Mathews's November 28 letter had been addressed.

Moreover, Mathews has not submitted any evidence beyond his own continued denial that would call into question Kartman's review of the conduct report, or call into question Cichanowicz's conclusions at Mathews's hearing that: Mathews passed the letters to another

---

[4] I addressed the destruction of the letters in resolving Mathews's motion for sanctions. (Dkt. 107.) While Mathews continues to take issue with defendants' explanation that the letters were accidentally destroyed, I will not revisit that issue in this order. Mathews has not submitted any evidence contradicting my previous findings, nor has Mathews averred that defendants' representations about the content of the letters are inaccurate.

inmate; Brown was more credible than Mathews; and that the circumstances surrounding the cell searches and the content of the letters supported Brown's belief that Mathews had violated Wis. Admin. Code § DOC 393.24(2), Group Resistence and Petitions. (Ex. 102 to Ray decl. (dkt. 37-3) at 16-18.) It is worth noting (again) that throughout this process, WSPF staff was aware of and considered Mathews's denial of gang affiliation and found this denial not credible in light of all the other evidence in the record. Given the elements that Mathews must prove to prevail on his First Amendment claim in this civil lawsuit, his continued denial of gang affiliation does not put a material fact into dispute so as to allow this claim to survive summary judgment.

Mathews's attempts to provide innocent explanations for the letters are unavailing. He claims that he was drafting the letters and asking Garner for assistance in an attempt to *prepare* a permissible group complaint, arguing that he and other inmates had done so previously without punishment. Mathews points out that the letters support this conclusion because no one else signed it and he did not circulate it. Both of these arguments contradict the undisputed evidence that Garner, and possibly Hayes, had seen the letters, and the letters were drafted to be from "the prisoners of WSPF." More importantly, this explanation ignores all of the other, fact and circumstances that Brown considered while investigating the interaction between Mathews, Hayes, and Garner in December 2015.

As he did in his motion for preliminary injunction, Mathews cites *Jones v. Russell*, 149 F. Supp. 3d 1095, 1101-02 (W.D. Wis. 2015), as support for his opposition to summary judgment. In *Jones*, the defendant employees at Waupun Correctional Institution (WCI) had seized Jones's letter to another inmate (Wheeler) outlining Jones's past involvement with the Gangster Disciples at WCI, during which period Wheeler had refused to join the GDS. Jones explained that the letter actually was a notarized evidentiary affidavit for Wheeler to submit in

his state court case. WCI's staff nonetheless found Jones guilty of gang activity, destroyed his affidavit and sentenced Jones to disciplinary segregation. When ruling on the parties' summary judgment motions, the court found that the defendants could not explain how Jones's court-bound affidavit reporting *past* gang conduct posed a current security risk at WCI. Defendants' claim that Jones's affidavit was "gang-related," without more, did not connect their seizure of the affidavit to a legitimate penological interest. 149 F. Supp. 3d at 1101-02. On its facts, the *Jones* decision is reasonable and logical. It also is distinguishable from Mathews's case.

Here, Mathews's September and December letters were directed to the security personnel (Gardner and Brown) and WSPF Administration, and the letters set forth proposals for WSPF staff. Mathews did not direct the letters to Warden Boughton as he previously had done in the November 28 letter, nor did he direct it to the ICRS or to WSPF's administration in a general way. Rather, Mathews directed the letters to Captain Gardner and Brown first, and then the WSPF administration. Brown viewed this as strategic and possibly threatening, because Brown and Gardner handle gang-related security concerns at WSPF, not conditions-related concerns.

In these circumstances, Brown's decision falls into the category of the "difficult judgments concerning institutional operations for which prison administrators receive deference, so long as the judgment was reasonable." *Carter v. Ziegler*, No. 14-cv-512, 2016 WL 7383754, at *8 (W.D. Wis. Dec. 20, 2016), and there is sufficient undisputed evidence supporting Brown's conclusion. Accordingly, I agree with defendants that the first *Turner* factor militates in their favor.

### B. **The Remaining *Turner* Factors**

Mathews had an alternative method to raise the concerns voiced in the letters. Mathews could have followed the procedures for submitting a proper group complaint (as he had done in the past) by submitting a letter to Warden Boughton without including any other inmates. Mathews chose not to do so, and he has not explained why he did not follow that procedure.

Rather, Mathews relies on the argument that both he and another inmate, Nate Lindell, previously had submitted letters to prison staff prior to submitting a group complaint but were not punished for it. (Lindell decl. (dkt. 51).) Lindell reports that he has not been punished for letters he submitted to Warden Boughton that included multiple issues, made requests on behalf of multiple inmates about cell assignment, and included objections about property restrictions. Lindell's report may be accurate, but this cannot establish that Conduct Report #2732167 was unreasonable. First, Mathews's September and December letters were not directed to Warden Boughton, they were directed to WSPF security personnel and the administration in general. Further, nothing in the s record suggests that Lindell's letters included language of the sort Mathews used that Brown found "demanding." Finally, the fact that another inmate's acts went unpunished does not establish that the group complaint procedure was not available to Mathews. Just because Lindell somehow skated across thin ice without falling through doesn't excuse Mathews from using the bridge to cross the pond.

The third factor requires the court to consider the impact of accommodating Mathews's right. This factor cuts against Mathews. Permitting Mathews to direct his letter to WSPF's security staff as well as the "WSPF administration" flouts the procedure for how inmates typically attempt to resolve disputes informally. Further, if security staff had to respond to and address matters of the type Mathews raised, this would divert resources from their actual role

at WSPF. Given all of the security concerns created by such petitions, WSPF would have to take measures to ensure that Mathews was not actually carrying out the goals of the Gangster Disciples, a task that definitely adversely impacts WSPF.

The fourth factor also weighs against Mathews because there are no easy alternatives available for the prison. Rather, the easy alternative already existed when Mathews prepared the letters. Assuming, *arguendo*, that Mathews actually intended to raise legitimate concerns and file a proper ICRS complaint, then Mathews could have addressed his letter to Warden Boughton, softened the language, and kept it to himself, all of which would have complied with DOC policy. Yet Mathews chose to take the additional steps that led Brown to conclude, and others to agree, that Mathews was preparing an improper group petition on behalf of the Gangster Disciples.

Mathews suggests that the defendants could have chosen not to deliberately misinterpret his letters and punish him, and instead could have talked to him about the issues in his letters. Mathews also suggests that defendants could have vacated the conduct report as they did for Garner. These suggestions are unpersuasive. In fact, accepting them as "easy alternatives" would require this court to draw multiple inferences that would contradict the evidence of record: that Brown's conclusions were wrong, that Brown did not speak to Mathews about the letters after searching his cell, and that the disposition of Mathews's conduct report suffered from some objectively determinable procedural error.

For all of these reasons, I am granting defendants' motion for summary judgment on Mathews's First Amendment retaliation claim.

## II.      Mathews's Due Process Claim

I granted Mathews leave to proceed on a Fourteenth Amendment due process clause claim on the theory that Wis. Admin. Code § DOC 303.24(2), was unduly vague as applied to him. The Court of Appeals for the Seventh Circuit has held that in the prison context, regulations must be sufficiently definite to give prisoners of ordinary intelligence reasonable notice of what conduct is prohibited. *Rios v. Lane*, 812 F.2d 1032, 1038 (7ᵗʰ Cir. 1987) ("a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process law"); *Toston v. Thurmer*, 689 F.3d 828, 832 (7ᵗʰ Cir. 2012) ("A deprivation of liberty without fair notice of the acts that would give rise to such a deprivation violates the due process clause[.]"); *see also Jones v. Russell*, 149 F. Supp. 3d 1095, 1105 (W.D. Wis. Dec. 9, 2015) (granting summary judgment in prisoner's favor after finding that policy prohibiting a similar type of petition violated due process as applied to that prisoner).

### A.      Liberty Interest

Before delving into whether Mathews's received fair notice, I need to address whether Mathews was deprived of a liberty interest. In the Seventh Circuit, "a liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009).   Courts in this circuit have generally concluded that short-term placements in segregation---typically less than six months---do not involve a liberty interest.  Longer periods of segregation *do* require inquiry into the conditions to determine if they impose an "atypical, significant" hardship.  *Id.* at 697 (citing *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005)

(prisoners' liberty interests implicated when placed in segregation depriving them of virtually all sensory stimuli or human contact for an indefinite period of time)). In *Marion*, however, the court recognized that "periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions." *Id.* at 699. Since *Marion*, the Seventh Circuit has instructed that "prison officials and judges . . . be alert for the potentially serious adverse consequences of protracted segregation as punishment for misbehavior in prison." *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015). As a result, district courts typically have concluded that when the duration of confinement in segregation-like conditions exceeds one year, then a liberty interest has been lost.

As defendants point out, Mathews was placed in disciplinary separation for 50 days, which is not long enough to implicate a constitutional liberty interest. But this doesn't completely end the analysis because Mathews focuses his loss of liberty on the time he spent in administrative confinement, which lasted for approximately a year and a half – from March 9, 2016, until September of 2017. While defendants challenge whether Mathews's administrative confinement conditions implicate a liberty interest, they raise a threshold challenge whether Mathews even may pursue this claim in this lawsuit, so I'll begin there.

Defendants correctly point out that in Mathews's amended complaint, he challenged *only* the issuance of Conduct Report #2732167. He did not tease out his transfer to administrative confinement status and he did not name as defendants members of the committee. Defendants' position is that if Mathews had wanted to challenge his continued placement on administrative confinement, then he was required to raise a separate claim challenging his transfer to administrative confinement. This in turn would have required Mathews to exhaust his administrative remedies with respect to that claim in compliance with the PLRA. Defendants

made a similar argument in opposing Mathews's motion for preliminary injunction. I rejected that argument at that point because Mathews's request for release from administrative confinement status was related to his claim. Specifically, I concluded that the PLRA might permit me to grant the requested injunction because (1) Boughton, a defendant and WSPF's warden, had the authority to remove Mathews from administrative confinement status, (2) Boughton was involved in Mathews's administrative confinement review from February 2017, and (3) it appeared that, but for the conduct report, Mathews would not have been assigned to or kept in administrative confinement status. (Dkt. 77, at 8 n.3.)

If Mathews's due process claim focused on the process he received related to the conduct report and the specific punishment meted out, then this argument would have more merit. But Mathews's due process claim is broader. In Mathews's amended complaint, filed on November 3, 2016 (when he was on administrative confinement status), Mathews complained about his placement in restrictive housing generally, without distinguishing between his time in disciplinary separation and administrative confinement. One of his requested forms of relief was release from restrictive housing. (Am. Comp. (dkt. 16) at 16-17.) Mathews was challenging his loss of liberty related to *all* time he spent in restrictive housing as a result of the conduct report, and the record of his transfer to and repeated placement in administrative confinement establishes that the challenged conduct report bore heavily on this placement. Accordingly, while I agree with defendants that Mathews's due process claim does not arise from the *decisions* related to his transfer to and continued placement on administrative confinement, I will not ignore his time in administrative confinement when evaluating whether Conduct Report #2732167 resulted in a loss of liberty.

The conditions Mathews endured while in administrative confinement do not appear to have deprived him of human interaction or sensory stimuli. I reached this same conclusion at the preliminary injunction phase. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 742 (7th Cir. 2013) (affirming qualified immunity finding of no loss of liberty where inmate was placed with a confrontational inmate, faced psychological problems, and had only weekly access to the shower and prison yard). Indeed, the record shows that Mathews was able to leave his cell for at least a few hours every week and have access to outdoors as the weather permitted; he had personal access to WSPF staff every day; he received adequate clothing, although not his desired items; and the temperature of his cell appears adequate; he had a television in his cell; and he had some, albeit limited, access to the library and legal materials. Mathews received treatment for mental health and physical health issues. Mathews avers that he "was denied visits, phone calls, and certain publications," that suffered from severe depression and physical pain, and that he had to endure disgusting and offensive behavior from other inmates. And the fact remains that Mathews remained in disciplinary separation and administrative confinement for well over a year. In light of the length of he spent in restrictive housing, I cannot conclude as a matter of law that Mathews's time in both disciplinary separation *and* administrative confinement did not result in a loss of liberty. Nonetheless, I am granting judgment in defendants' favor on this claim.

## B. § DOC 303.24(2) "As Applied" was Not Unconstitutionally Vague

On this record, a reasonable fact finder could not conclude that § DOC 303.24(2) was unduly vague as applied to Mathews. The analytical starting point is the language of the regulation, which makes it punishable for an inmate who "[j]oins in or solicits another to join in any group petition or statement." I agree with defendants that this language is sufficiently

clear to notify Mathews that letters drafted from more than one prisoner–such as "prisoners of WSPF" and "all concerned prisoners at WSPF"–fall under this prohibition.

For his part, Mathews argues that his activity was authorized by Wis. Admin. Code § DOC 309.155(5), the policy that permits inmates to provide legal services to other inmates. In his view, because he was attempting to resolve his dispute informally prior to filing a proper group complaint through the ICRS, he was allowed to use Garner to help him craft the letter. Yet, even assuming that Mathews was using Garner to help him write the letters, staff saw Hayes near both his cell and Garner's cell, and Mathews in off-limits area of WSPF, allowing staff to infer that at least a third inmate could have known about the letters. Moreover, Mathews directed the concerns raised in the letter to a group of people – WSPF security personnel and administration, and, more importantly, *from* a group of people – "the prisoners of WSPF"– which staff fairly interpreted to as a group statement or petition.

Furthermore, prisons "can avoid due process problems related to the application of otherwise vague regulations by showing that the prisoners received fair notice of the type of conduct that was proscribed from other sources." *Jones*, 149 F. Supp. 3d at 1104 (citing *Meyers v. Aldredge*, 492 F.2d 296 (3d Cir. 1974)). Here, Conduct Report #2732167 was not Mathews's first exposure to DOC's policy prohibiting inmates from joining or soliciting others to join in a group petition or statement. The record before this court establishes that Mathews had ample notice of the circumstances that might implicate this policy.

In 2011, Mathews received a conduct report for violating the a prior iteration of this policy, Wis. Admin. Code § DOC 303.20(2), which also prohibited inmates from joining or soliciting other to join in a group petition or statement. In that situation, Mathews had been caught trying to make copies of a letter from the "AC prisoners" (prisoners on administrative

confinement), that asked the warden for more property items in administrative confinement. Just as he does now, in 2011 Mathews had argued that he was trying to informally resolve an issue before filing a complaint. Yet Mathews was found guilty. Perforce, Mathews was aware that he could be punished for preparing or attempting to circulate a letter from more than one inmate when circumstances suggested that other inmates knew about or were involved in this endeavor.

Conversely, Mathews knew from his November 2015 letter exchange with Warden Boughton– in which Mathews raised concerns of his own along with those of other inmates – that he would *not* be punished for attempting to informally resolve an issue prior to filing an inmate complaint if he wrote Warden Boughton a letter and signed it only from himself. Additionally, Mathews has been involved in other permissible group complaints that went unpunished, and he has not submitted evidence that the informal attempts at resolving those issues involved letters similar to his letters that were the subject of Conduct Report #2732167.

I am not persuaded by Mathews's argument that the informal dispute resolution process is unclear because other inmates have composed similar letters and were not punished. As noted above, that Lindell might have gotten away with something does not mean that Mathews was free to follow in his footsteps. Moreover, that situation is distinguishable. Lindell submitted an affidavit averring that he wrote Warden Boughton a letter in which he raised concerns of other inmates, but this letter was directed solely to the Warden and it was from Lindell alone. (Dkts. 140-4, 140-5, 140-6.) To the extent the language of § DOC 303.24(2) could be viewed as not sufficiently warning Mathews away from preparing a statement or petition from a group of prisoners, Mathews's own experience establishes that he knew how to craft a permissible letter in an attempt to informally resolve an issue before submitting a group complaint.

Accordingly, defendants are entitled to judgment in their favor on this claim because Mathews had fair notice that his letters – drafted to be from a group of prisoners among circumstances suggesting that other inmates had seen the letter – may violate § DOC 303.24(2).


### III.    The Defendant Are Entitled to Qualified Immunity

While I need not make this finding, defendants argue that qualified immunity shields all of them from liability here. Qualified immunity protects government employees from liability for civil damages for actions taken within the scope of their employment unless their conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quotations and citations omitted). Qualified immunity "give[s] government officials breathing room to make reasonable but mistaken judgment about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendant raises it. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).

As to his First Amendment claim, while Mathews cite a number of cases applying the *Turner* standard to punishments of gang activity, he has not cited any instances in which prison staff possessed the depth and breadth of information that Brown and other staff possessed when

evaluating the risks created by Mathews's letters.  While prior cases don't have to be on all fours with the situation confronting the defendants in the instant case, I am not aware of any case sufficiently similar to this one on its facts so as to have obliged the defendants to pause, reconsider and reverse course.  If anything, the case law cited above at 29-30 probably would reassure the defendants that they were on solid ground proceeding as they did.

Similarly, as to Mathews's due process claim, I noted above that lack of clarity in the case law as to when a liberty interest arises in the context of segregation placement.  Mathews has not cited any case concluding as a matter of law that the conditions and time Mathews spent in administrative confinement resulted in a loss of a liberty interest. More importantly, Mathews has not cited, and I have not located any case establishing that a policy similar to § DOC 303.24(2) has been held  unconstitutionally vague in circumstances similar to Mathews's, that is, where the defendant's conduct fell squarely within the language of the policy and that defendant previously had been punished for engaging in similar conduct.

Accordingly, even if I were to have concluded that a trial were necessary as to either of Mathews's claims, he would be precluded from seeking or obtaining monetary damages.

ORDER

IT IS ORDERED that:

(1)     Defendants' motion for summary judgment (dkt. 91) is GRANTED.

(2)     Defendants' motion to strike (dkt. 110) is GRANTED.

(3)     Plaintiff's motions related to his summary judgment filings (dkts. 136, 142) are
        GRANTED. His remaining motions (dkts. 129, 130, 132, 134, 135, 146, 147)
        are DENIED.

(4)     The clerk of court is DIRECTED to enter judgment in defendants' favor and close
        this case.

Entered this 5th day of March, 2018.

BY THE COURT:

/s/

STEPHEN L. CROCKER

Magistrate Judge